IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION


SYSTEMS SPRAY-COOLED, INC.                                    PLAINTIFF


v.                            Case No. 1:16-cv-1085


FCH TECH, LLC; WILLIAM HENRY; and
J. MICHAEL CAMPBELL                                           DEFENDANTS


## MEMORANDUM OPINION

Before the Court is an Amended Motion for Preliminary Injunction filed by Plaintiff

Systems Spray-Cooled, Inc. ("Systems"). ECF No. 61.  Defendants FCH Tech, LLC, William

Henry and J. Michael Campbell (collectively referred to as "Defendants") have filed a response

in opposition to the motion. ECF No. 27.  On December 12, 2016, the parties appeared before the

Court for a hearing on the motion.  After the hearing, Plaintiff submitted a post-hearing brief in

support of its Motion for Preliminary Injunction. ECF No. 44.  Defendants also submitted a post-

hearing brief in opposition to the motion. ECF No. 42.  The Court finds this matter ripe for its

consideration.

## I. BACKGROUND

This case involves the alleged misappropriation of trade secrets and confidential

information from Systems.  Systems is a Tennessee corporation with principal offices in

Nashville, Tennessee and El Dorado, Arkansas.  In 1999, Systems purchased the Systems Spray-

Cooled technology and business from UCAR Carbon Company, Inc. Systems Spray-Cooled

technology is a low pressure spray-cooling system designed to cool furnaces and other

equipment with extreme heat loads in the steel industry. Systems' Spray-Cooled technology is

unique in the steel industry, as most within the industry use traditional high pressure cooling systems.

Defendants Henry and Campbell are former long-term employees of Systems. Campbell was employed by Systems or one of its subsidiaries from September 1992 until February 2013. Campbell held numerous positions within Systems during his tenure. Campbell was hired as an engineer and eventually rose to Executive Vice President of Systems in July 2012. Henry worked as a draftsman and designer for Systems from January 2007 to September 2013. During their employment with Systems, both Campbell and Henry signed employment agreements which contained confidentiality and non-compete provisions. Campbell was terminated from his position with Systems for reasons unrelated to the instant motion, while Henry resigned from his position voluntarily.

In October 2015, Henry and Campbell formed FCH Tech, LLC, a Tennessee company which provides custom designed steel plate fabrications and machine parts. Henry and Campbell acknowledge that FCH Tech was formed, in part, with the intent to directly compete with Systems. Prior to the formation of FCH Tech, Systems was the only provider of low pressure, spray cooling equipment in the steel industry.

On September 20, 2016, Systems filed suit against Defendants. The Complaint alleges that Henry and Campbell executed employment agreements while employed with Systems that included non-compete and confidentiality provisions prohibiting the taking, disclosure, or use of Systems' trade secrets and confidential information. Although Systems concedes that Henry and Campbell are no longer bound by the non-compete provisions of the employment agreements, Systems alleges that Henry and Campbell are both subject to the confidentiality provisions until October 2018 and February 2018, respectively.

Systems' Complaint alleges that Henry and Campbell breached the terms of their confidentiality provisions by taking and possessing Systems' trade secrets and confidential information in violation of the Defense of Trade Secrets Act, 18 U.S.C. § 1832, *et seq.*, the Arkansas Trade Secrets Act, Ark. Code Ann. §§ 4-75-601, *et seq.*, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* In addition, Systems asserts claims against Defendants for breach of employment agreement, tortious interference with business expectancy, breach of fiduciary duty, and unjust enrichment.

On November 11, 2016, Systems filed a Motion for Preliminary Injunction. ECF No. 12. On March 30, 2017, Systems filed an Amended Motion for Preliminary Injunction. ECF No. 61. In the amended motion, Systems seeks to enjoin Defendants, as well as anyone acting in concert with Defendants, from further misappropriation, disclosure and use of Systems' trade secrets and confidential information until a final determination on the merits of the pending litigation has been made. In addition, Systems seeks to enjoin Defendants from directly or indirectly designing or supplying low pressure spray-cooling equipment for the steel industry for a three year period.

## II. LEGAL STANDARD

"The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984). "A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant." *Roudachevski v. All–Am. Care Centers, Inc.*, 648 F.3d 701, 705 (8th Cir.2011). It is well-settled that applications for preliminary injunctions within the Eighth Circuit require the Court to consider the following four factors: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to

the movant; (3) the balance between the harm suffered by the movant and the harm that other interested parties will incur if an injunction is granted; and (4) whether the issuance of an injunction is in the public interest. *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). The Court will separately address each of these factors.

### III. DISCUSSION

#### A. Substantial Likelihood of Success

##### a. Arkansas Trade Secrets Act

###### i. Whether the Information in Question Qualifies as Trade Secrets

The first *Dataphase* factor the Court must consider is whether Systems is likely to succeed on the merits. In order to evaluate Systems' likelihood of success on the merits, the Court must first determine whether the information in question constitutes a "trade secret" under Arkansas law. Under the Arkansas Trade Secrets Act, a trade secret is defined as information, including a formula, pattern, compilation, program, device, method, technique, or process, that derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. Ark. Code Ann. § 4-75-601(4)(A). The Act also requires that the information at issue be the subject of reasonable efforts to maintain its secrecy. Ark. Code Ann. § 4-75-601(4)(B).

In addition to the definitions contained within the Arkansas Trade Secrets Act, the Arkansas Supreme Court has established six factors to determine whether information is a trade secret. Arkansas courts consider the following factors to determine whether information qualifies as a trade secret: (1) the extent to which the information is known outside the business; (2) the extent to which the information is known by employees and others involved in the

business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff and its competitors; (5) the amount of effort or money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could properly be acquired by others. *Saforo & Assocs., Inc. v. Porocel Corp.*, 991 S.W.2d 117, 120 (Ark. 1999). The Arkansas Supreme Court has made clear that, despite being one of many factors to consider, a company's effort to maintain the secrecy of information is a prominent one. *ConAgra, Inc. v. Tyson Foods, Inc.*, 30 S.W.3d 725, 730 (Ark. 2000).

Systems contends that Defendants misappropriated information regarding its Spray-Cooled technology that qualify as technical trade secrets, including design drawings. Systems further maintains that Defendants misappropriated its financial and business trade secrets, including pricing estimate information, customer lists, revenue forecasts and financial statements. The Court will consider in turn whether each of the aforementioned categories of information qualifies as a trade secret.

### 1. Design Drawings

First, Systems contends that its design drawings qualify as trade secrets. During the preliminary injunction hearing, the Court heard testimony from Dick Arthur, an expert on low pressure, spray-cooling equipment. Arthur testified about the techniques and features Systems has developed as a result of its experience designing and supplying low pressure, spray-cooling equipment for the steel industry. Arthur testified that such features include proprietary water distribution patterns for Systems' spray-cooled roofs. Systems asserts that the design drawings at issue embody the water distribution patterns and other features Systems has developed and, therefore, qualify as trade secrets. Arthur further testified that he reviewed the publicly available

exhibits provided by Defendants, including patents, and provided his opinion that none of the exhibits contained Systems' trade secrets. Arthur also testified that none of Defendants' exhibits contained specific information that can be derived from Systems' design drawings.

In addition, Systems argues that it has taken reasonable measures to safeguard its design drawings. Systems offered testimony and evidence establishing that each of the design drawings contains a legend indicating that the drawing is confidential and exclusively owned by Systems. Systems also offered evidence to demonstrate that it executes confidentiality agreements with vendors, fabricators and licensees to limit the use and disclosure of the design drawings. The Court also heard testimony from Chuck Hays, CEO of the Systems Group, concerning confidentiality provisions contained within employment agreements that each Systems employee is required to sign. Hays specifically testified that the confidentiality provisions require employees to obtain written consent prior to disclosing any confidential information. According to Hays, the confidentiality provisions explicitly define confidential information to include Systems' design drawings. Systems introduced evidence to establish that Defendants Henry and Campbell both signed employment agreements that included the confidentiality provisions. It is also undisputed that Systems has expended a substantial amount of time and resources developing the technology embodied within the design drawings.

In response, Defendants argue that Systems' design drawings do not qualify as trade secrets. Defendants maintain that the information needed to design competing low pressure spray-cooling systems is readily ascertainable. Defendants specifically assert that Systems' expired patents and other publicly available information, such as technical materials written by Systems employees, contain sufficient information to allow Defendants to design and manufacture a competing system using the technology. In support of this contention, Defendants

have submitted exhibits containing Systems' patents and other publicly available information that, according to Defendants, can be used to design spray-cooling systems. In addition, Defendant Campbell testified that Systems' spray-cooling technology is readily ascertainable and can be reverse engineered by reading Systems' patents, as well as by visually inspecting and measuring equipment owned by Systems' prior customers.

As previously stated, in order for information to qualify as a trade secret, it cannot be readily ascertainable to others that might be interested in learning the information. Ark. Code Ann. § 4-75-601(4)(A). Arkansas trade secret law does not protect information that is readily ascertainable through legitimate means such as reverse engineering or simple observation. *See Coenco, Inc. v. Coenco Sales, Inc.*, 940 F.2d 1176, 1179 (8th Cir. 1991). Reverse engineering is described as the "process of starting with a known product and working backward to find the method by which it was developed." *Gibraltar Lubricating Servs. v. Pinnacle Res. Inc.*, 486 S.W.3d 224, 226 (Ark. Ct. App. 2016). The expense and amount of effort it takes to reverse engineer a product are factors to consider when determining whether or not information is readily ascertainable. *Id*. at 227.

Defendants have not presented convincing evidence that Systems' design drawings do not qualify as trade secrets. With regard to Systems' design drawings, Defendant Campbell offered contradictory testimony about whether specific information contained within Systems' design drawings is publicly available through patents and technical materials. However, Arkansas courts have recognized that "[e]ven where information about a product or its ingredients is publicly available, such as through a patent, it may be the combination of characteristics and components that offers a competitive advantage." *Gibraltar*, 486 S.W.3d at 228. Here, Arthur testified that the patents offered by Defendants only provide general

information and did not contain the specific information necessary to build a spray-cooling system that can be determined from Systems' design drawings.

In addition, although Defendants argue that a person of ordinary skill in the art of engineering would be able to reverse engineer much of Systems' alleged trade secrets in theory, Defendants have not submitted any testimony or evidence to demonstrate how much time, money or effort it would take to actually duplicate Systems' low pressure, spray-cooling technology. Without such evidence, the Court cannot determine whether Systems' spray-cooling technology is indeed readily ascertainable at this stage of the litigation.

The Court concludes that Systems has sufficiently shown that it has taken reasonable efforts to protect the secrecy of its design drawings. In light of the six *Safaro* factors that the Court must consider in determining whether information is entitled to trade secret protection, the Court concludes that, on balance, Systems has offered sufficient evidence to prove that its design drawings qualify as trade secrets under Arkansas law at this stage of the litigation.

### 2. Pricing Information

Systems next argues that its pricing information qualifies as a trade secret. Systems specifically argues that an internal estimate sheet qualifies as a trade secret. During the preliminary injunction hearing, Systems introduced testimony from Hays, CEO of the Systems Group, regarding the internal estimate worksheet. Hays testified that the estimate worksheet is essentially a spreadsheet and that the information contained within the worksheet demonstrates how Systems calculates its prices for every project. Hays testified that the worksheet includes historical data, such as the cost of labor to do a particular engineering project. Hays further testified that Systems' estimate worksheets are internal documents and not available to the public. Systems asserts that the pirating of this information would be detrimental because

competitors would be able to easily undercut Systems' pricing. Hays further testified that employment agreements signed by Systems' employees, including Defendants Campbell and Henry, during the course of their employment designate "pricing information," such as the internal estimate worksheet, as "confidential information."

Defendants argue that the internal estimate worksheet is not entitled to trade secret protection. Defendants refute Systems' assertion that they currently possess Systems' internal estimate worksheets. Furthermore, Defendants contend that any information contained within the estimate worksheet is now outdated and, therefore, not entitled to trade secret protection. At the preliminary injunction hearing, Defendant Campbell testified that the pricing information that he had access to while employed at Systems is now stale. In addition, Campbell testified that Systems' estimate worksheet would be of little utility because Defendants use a different pricing structure than Systems.

At the preliminary injunction hearing, Systems provided testimony to refute Defendants' contention that the information contained within the internal estimate worksheet is stale. Hays testified that the estimate worksheet at issue was recently used to place a bid on a project to replace a furnace roof at one of Nucor's facilities. Hays stated that Defendants also placed a bid on the Nucor project. Hays further testified that, at the time of the hearing, the quote was still outstanding for the project.

Arkansas courts have previously held that a company's pricing information may be worthy of trade secret protection under the proper circumstances. *Bradshaw v. Alpha Packaging, Inc.*, 379 S.W.3d 536, 539 (Ark. App. 2010). Although Arkansas courts are silent on the issue, the Eighth Circuit has considered similar trade secret laws from other states and held that a trade secret may lose its protected status upon a showing that the information has become stale or

outdated. *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 958 (8th Cir. 2007) (applying Missouri trade secrets law). "Determination of when trade secret information becomes stale cannot be made by reference to a bright line rule and necessarily requires fact specific consideration." *Id*. (internal citation omitted).

In *Hurst*, the Eighth Circuit rejected the defendant's conclusory argument that the plaintiff's trade secrets grew stale and unworthy of protection. *Id*. at 957. The Eighth Circuit agreed with the district court's finding that the defendant's argument lacked merit because the defendants failed to offer any evidence in support of their position or provide "any facts and circumstances to suggest that the information [was] stale." *Id*. at 958.

Similar to the defendants in *Hurst*, Defendants have failed to offer any convincing facts to suggest that the information contained within Systems' estimate worksheet is stale. Systems presented evidence which established that the internal estimate worksheet includes numerous formulas used to calculate the pricing for a particular project. Although Defendants maintain that information such as raw materials, labor and shipping change over time, it appears that this information may be easily adjusted within Systems' worksheet. Moreover, it is unclear if the formulas within the worksheet used to calculate pricing are stale. As a result, the Court is unconvinced that the information contained within the internal estimate worksheet is stale.

Moreover, the Court finds that Defendants' argument that they would not benefit from Systems' pricing information to be inapposite. Regardless of whether Defendants utilize a different pricing scheme than Systems, knowing how Systems estimates its costs for particular projects provides a competitive advantage to its competitors. Accordingly, the Court finds that Systems has sufficiently shown that its internal estimate worksheet is entitled to trade secret protection at this stage.

### 3. Customer Lists

Systems further contends that its customer lists qualify as trade secrets. Systems maintains that its customer lists compile large quantities of information, including the names and contact information of its customers. Systems also notes that the employment agreements signed by Systems' employees, including Defendants Campbell and Henry, during the course of their employment designate customer lists as "confidential information."

Defendants contend that Systems' customer lists do not qualify as a trade secret. Defendants specifically argue that Systems' customer lists are readily ascertainable and are not kept as confidential because Systems has published the names and contact information of its customers on prior versions of its website. Defendants further maintain that Systems has provided its customer lists to trade publications, such as the Association for Iron & Steel Technology, as well as trade directories.

The Arkansas Supreme Court has held that customer lists obtained through the use of business efforts and the expenditure of time and money are afforded trade secret protection so long as the lists are not readily ascertainable and are kept confidential. *Allen v. Johar*, 823 S.W.2d 824, 826-27 (Ark. 1992) (holding that a customer list and files which included detailed information about customers such as "personality traits, hobbies and likes, credit history, buying habits and pricing agreements" and were kept confidential qualified as trade secrets). In the present case, the Court finds that Systems has not proven that its customer lists rise to the level of trade secrets at this stage of the litigation. Specifically, Systems has failed to show that its customer lists differ from the information that can be readily obtained from the internet. Defendants presented testimony and evidence indicating that many of Systems' customer names, contact information and the type of service provided can be found on the internet from older

versions of Systems' website and within trade publications. Although Systems is correct in noting that customer lists may qualify as trade secrets and that its employment agreements designate such lists as confidential, the Court concludes that Systems has failed to show that the information contained within its customer lists is not readily ascertainable or actually kept confidential at this stage.

### 4. Revenue Forecasts and Financial Statements

Lastly, Systems argues that its revenue forecasts and financial statements qualify as trade secrets. Systems specifically contends that its annually prepared revenue forecasts and financial statements qualify as trade secrets because the reports show the overall financial structure of its business. Systems has also submitted evidence at the preliminary injunction hearing indicating that the reports are considered confidential information per Systems' standard employment agreement.

Defendants argue that this information is updated annually and that any information Defendants had access to is now outdated and no longer worthy of trade secret protection. Defendant Campbell also testified that he was responsible for creating the annual revenue forecasts while employed with Systems and that the report was never stamped or labeled as confidential. Campbell's testimony also revealed that the annual reports were saved on Systems' network in a manner where all employees could retrieve them. With regard to the financial statements, Campbell testified that he did not recall seeing a confidentiality stamp on the documents.

After reviewing the record and the exhibits introduced at the preliminary injunction hearing, the Court finds that Systems has failed to provide sufficient evidence regarding its efforts to maintain the secrecy of its revenue forecasts and financial statements. It also appears

that neither of these documents was introduced into evidence for the Court's inspection. As a result, the Court concludes that it lacks sufficient evidence to determine whether Systems' revenue forecasts and financial statements qualify as trade secrets at this stage.

### ii. Whether Systems' Trade Secrets were Misappropriated

Having found that Systems has sufficiently demonstrated that its design drawings and internal estimate worksheet qualify as trade secrets, the Court must next consider whether Defendants misappropriated them. The Arkansas Trade Secrets Act authorizes courts to issue an injunction against actual or threatened misappropriation of trade secrets. Ark. Code Ann. § 4-75-604(a). The act defines "misappropriation" as acquisition of another's trade secret by a person who "knows or has reason to know that the trade secret was acquired by improper means." Ark. Code Ann. § 4-75-601(2)(A). The act defines "improper means" as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Ark. Code Ann. § 4-75-601(1). Misappropriation also occurs when a person acquires another's trade secrets through improper means and, without consent, discloses or uses the trade secret. Ark. Code Ann. § 4-75-601(2)(B)(i). Lastly, misappropriation occurs when a person discloses or uses another's trade secret and knew or had reason to know that his knowledge of the trade secret was (1) derived from a person who acquired the trade secret through improper means; (2) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (3) derived from a person who owed a duty to the trade secret owner to maintain its secrecy or limit its use. Ark. Code Ann. § 4-75-601(2)(B)(ii).

1. **Whether Defendants Misappropriated Systems' Trade Secrets via Electronic Storage Devices**

Systems maintains that its trade secrets were misappropriated by Defendants in multiple ways.[1] Systems first argues that Defendants acquired its trade secrets by improper means. Systems specifically argues that Defendants Campbell and Henry connected external storage devices to their Systems-issued laptops and downloaded numerous files containing trade secrets, such as design drawings and internal estimate worksheets. According to Systems, neither Campbell nor Henry returned any of the external storage devices to Systems after leaving the company.

Systems offered testimony from Yaniv Schiff, a computer forensics expert who performed an analysis of Defendants' Systems-issued computers. Schiff stated that Defendant Campbell connected an external storage device to his laptop two days after his employment was terminated. Schiff also testified that Defendant Henry connected external storage devices to his laptop after submitting his notice of resignation but before his last day of employment. According to Schiff, several folders on the external storage devices matched the names of folders listed on Systems' servers. Systems argues that these findings demonstrate that Defendants' external storage devices contained a substantial amount of Systems' confidential information and trade secrets.

On November 11, 2016, Systems filed the original Motion for Preliminary Injunction, as well as a Motion for Expedited Discovery. The Motion for Expedited Discovery included a request for Defendants to produce for inspection any hard drives and external storage devices used by Defendants. Defendants subsequently produced for inspection file listings and other

---

[1] In its post-hearing brief, Systems argues that Defendants misappropriated its design drawings by disclosing the drawings to a third party. On March 2, 2017, the Court entered an order striking the evidence Systems offered in support of this assertion. *See* ECF No. 50. Accordingly, the Court will not consider the merits of this claim.

data contained on two computers used by Defendants Henry and Campbell. An analysis of this information by Schiff revealed that the operating systems on the computers were installed on November 14, 2016. The analysis further revealed that CCleaner, a program used to delete unwanted files from hard drives, was run on Campbell's computer on November 17, 2016 and on Henry's computer on November 19, 2016. Defendants later revealed that the computer hard drives had been replaced and destroyed "in the ordinary course of business" as a result of technical issues.

On February 22, 2017, the Court issued an order granting Systems' Motion for Default Judgment or, Alternatively, an Adverse Inference. *See* ECF No. 46. In the order, the Court found that Defendants intentionally destroyed their hard drives in order to prevent Systems from inspecting them in this litigation. As a result, the Court awarded Systems an adverse inference instruction, as well as attorneys' fees and costs in connection with the filing of its motion for sanctions.

Systems now argues that Defendants' spoliation of the computer information is evidence that Defendants misappropriated Systems' trade secrets. Defendants maintain Systems has failed to prove that its trade secrets were misappropriated as there is no direct evidence in the record that they currently possess or have access to any of Systems' pricing information and design drawings.

"Direct evidence of theft of trade secret is rarely available and not required in order to maintain the action." *Sw. Energy Co. v. Eickenhorst*, 955 F. Supp. 1078, 1085 (W.D. Ark. 1997), *aff'd*, 175 F.3d 1025 (8th Cir. 1999). "Instead, a plaintiff may maintain an action for theft of trade secrets based entirely on circumstantial evidence." *Id*. Although there is no direct evidence that Defendants misappropriated Systems' trade secrets, the destruction of the hard

drives supports the conclusion that Defendants likely destroyed evidence of misappropriation. *See e.g.*, *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 877 (N.D. Ill. 2001) (finding that spoliation of computer data "support[ed] a negative inference that defendants destroyed evidence of misappropriation."). Accordingly, the Court finds that Systems has demonstrated a substantial likelihood of success on the merits in proving that its trade secrets were misappropriated by Defendants through the use of the aforementioned electronic storage devices.

### 2. Whether Defendants Misappropriated Systems' Trade Secrets by Knowingly Inducing Nucor to Breach its Duty to Maintain Secrecy

Systems next argues that Defendants misappropriated its trade secrets by knowingly inducing Nucor to disclose Systems' design drawings. Nucor is Systems' largest customer, and the design drawings at issue are of the low pressure, spray-cooling equipment located at Nucor's Yamato facility. Nucor is given design drawings for the equipment it purchases from Systems. Defendants began to perform consulting work for the Nucor Yamato facility in 2015. Defendants received the design drawings from Nucor and subsequently used the drawings to prepare a report for Nucor regarding modifications to part of a furnace roof located at the Yamato facility.

Systems maintains that Nucor was under a duty to maintain the secrecy of the design drawings. In support of this contention, Systems points to a confidentiality provision contained on each of its design drawings. The confidentiality provision states as follows:

> The materials and information, including the principles of design represented by this print, is the exclusive property of Systems Spray-Cooled Equipment, and it is confidential information. Accordingly, this information is submitted to you with the agreement that it is not to be produced, copied, or loaned in part or in whole. Nor is the information to be relayed to any other individual or company. All materials contained herein originating with Systems Sprayed-Cooled Equipment shall remain the property of Systems Spray-Cooled Equipment.

Plaintiff's Ex. No. 20.

Systems asserts that the above confidentiality provision prohibited Nucor from disclosing Systems' design drawings to another company or individual, including Defendants. At the preliminary injunction hearing, Systems introduced two emails sent from Defendant Henry to an employee at Nucor's Yamato facility. In the emails, Defendant Henry asks the Nucor employee to request a set of roof design drawings from Systems. The emails further reveal that Defendants obtained at least some of the requested design drawings. Systems asserts that Defendants Campbell and Henry prepared and approved some of the design drawings at issue and, as former employees, knew that each drawing contained a confidentiality provision. As a result, Systems maintains that Defendants misappropriated its trade secrets by knowingly inducing Nucor to breach its duty to maintain the secrecy of the design drawings.

Defendants maintain they did not misappropriate the Yamato facility design drawings. In essence, Defendants argue that Nucor did not owe Systems a duty to maintain the secrecy or limit the use of the design drawings and, therefore, Nucor was within its contractual rights to provide them with Systems' design drawings. Defendants first cite Chuck Hays' testimony which reveals that Systems sells its equipment to customers instead of entering into a licensing agreement. Defendants also highlight the testimony of Dick Arthur, which provided that other companies perform maintenance on equipment sold by Systems at its respective customers' facilities.

In addition, Defendant Campbell testified that Nucor represented that the design drawings were owned by Nucor. Defendant Campbell also testified that during his tenure with Systems, it was customary for Systems' customers to provide Systems' design drawings to third party

contractors for the purpose of performing maintenance. Defendant Campbell further testified that Systems was aware of this practice during his tenure with the company.

Defendants also point to the contracts entered into evidence as proof that Nucor was within its contractual rights to share the design drawings. Defendants highlight several contractual provisions within the various Nucor contracts in support of their contention. Defendants note that one of the contracts in evidence included the "design" of the equipment in the price paid to Systems. Defendants argue that this is evidence that Nucor paid for the design drawings, as well as the equipment. Moreover, Defendants assert that all of the contracts in evidence indicate that Nucor is responsible for repairing or replacing equipment parts that are used in normal operation, damaged or outside of warranty. Defendants further assert that all of the contracts obligate Systems to protect Nucor's confidential information and do not mention Systems' confidential information. Defendants also note that none of the Nucor contracts explicitly prohibit Nucor from inspecting, disassembling or reverse engineering any of the equipment Nucor purchases from Systems. Lastly, Defendants highlight that all of the Nucor agreements have "merger" clauses which state that the terms of the agreements "are exclusive and in lieu of any other commercial terms and conditions of sale."

A review of the Nucor contracts reveals that the terms of each contract are different. Although Defendants are right in their assertion that the contract for Nucor's Alabama facility contains language in the Price and Sale provision indicating that the total price of the sale of equipment includes "design," the contract between Systems and Nucor's Yamato facility does not contain similar language. In addition, all of the confidentiality provisions contained within the contracts appear to be silent with regard to the confidentiality of Systems' design drawings.

"[O]ne must have notice of both the fact that the information claimed to be a trade secret is in fact secret and the fact that disclosure by the third person is a breach of duty before one is subject to liability for the use or disclosure of the trade secret." *Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co.*, 407 N.E.2d 319, 323 (Mass. 1980) (citing Restatement of Torts § 757(c)). "Thus, if the actor knows (or should know) that the information proffered to him by one person is the trade secret of another he is put on inquiry as to the former's authority to disclose the information." *Id.* "Knowledge or the likelihood that a defendant knew of the wrongful character of the disclosure can and often must be proved by the weight of credible circumstantial evidence." *Id.* (internal citation omitted).

Upon consideration, the Court concludes that, at this stage in the litigation, there is insufficient evidence in the record to determine whether Defendants knowingly induced Nucor to breach its duty to maintain secrecy. First, there is insufficient evidence with regard to whether Nucor had a duty to maintain the secrecy of the design drawings. Systems maintains that Nucor's duty to maintain the secrecy of the design drawings arises from the confidentiality provisions located on each of its drawings. However, there is also uncontroverted evidence in the record which establishes that it was Systems' practice to provide its customers with design drawings with the knowledge that its customers will share the information with third party contractors.

In addition, there is insufficient evidence in the record to determine whether Defendants knew that obtaining the drawings would be a breach of Nucor's duty to maintain its secrecy. As stated above, the contracts in evidence are silent regarding the confidentiality of Systems' design drawings. Moreover, while each of the design drawings contains a confidentiality provision, Defendants maintain that Nucor informed them that the drawings were, in fact, owned by Nucor.

Systems' argument that Defendants are former Systems employees and, thus, were aware of Nucor's duty to maintain the secrecy of the drawings is also unavailing in light of the evidence presented indicating that Systems has previously provided its design drawings to its customers with knowledge that those customers would provide the drawings to subcontractors to make repairs to equipment as is the case in the present action. Accordingly, the Court finds that, at this stage of the litigation, Systems has failed to demonstrate that Defendants misappropriated its trade secrets by knowingly inducing Nucor to disclose Systems' design drawings.

Systems further argues that Defendants misappropriated its trade secrets by using its design drawings for the aforementioned study regarding modifications to part of a furnace roof located at the Yamato facility. Because the Court finds that Systems has failed to demonstrate that Defendants misappropriated the design drawings by receiving them from Nucor, the Court finds that this argument also fails.

### 3. Inevitable Disclosure Doctrine

Systems next argues that the inevitable disclosure doctrine applies in this case. Arkansas has adopted the inevitable disclosure doctrine, which allows a plaintiff to "prove a claim of trade secrets misappropriation by demonstrating that a defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Bendinger v. Marshalltown Trowell Co.*, 994 S.W.2d 468, 474 (Ark. 1999) (citing *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995)). Systems maintains that Defendants, as former employees, had full knowledge of its trade secrets and have formed a business that is in direct competition with Systems in the low pressure, spray-cooling equipment market. As a result, Systems contends that it is inevitable that Defendants will disclose and rely upon its low pressure, spray-cooling trade secrets through their work.

Defendants contend that the employment agreements signed by Defendants Campbell and Henry preclude Systems' reliance upon the inevitable disclosure doctrine. Defendants specifically argue that the restrictive covenants at issue expired after a two year period. The provision at issue, which is identical in both Defendants' employment agreements, states as follows:

> "Upon termination of employment, Employee agrees for a period of twenty-four months thereafter not to develop, manufacture or attempt to sell, directly or indirectly, goods that compete with Systems Spray Cooled, Inc.'s engineering, designs or products."

Plaintiff's Exs. 5 and 6. It is undisputed that the non-compete provisions within Defendants' employment agreements have expired. Defendants assert that Systems' reliance on the inevitable disclosure doctrine is an attempt to extend the two-year non-compete period.

At least one court faced with similar facts has rejected the application of the inevitable disclosure doctrine. In *Multiform Desiccants v. Sullivan*, the parties executed an employment agreement which contained a one-year covenant not to compete following the defendant's termination. No. 95-CV-0283E(F), 1996 WL 107102, at *1 (W.D.N.Y. Mar. 8, 1996). The plaintiff was a manufacturer of desiccant products, and the defendant was a former upper-level manager who was terminated from his position. *Id.* The defendant later began working for a corporation that directly competed with the plaintiff. *Id.* The plaintiffs filed suit against the defendant alleging that he breached his covenant not to compete, as well as misappropriated and divulged the plaintiff's trade secrets. *Id.* at *2. Citing Seventh Circuit precedent, the plaintiffs sought to enjoin the defendant, arguing that disclosure of its trade secrets would be inevitable because of the nature of the defendant's previous employment, as well as his "lack of candor" regarding his failure to return some of the plaintiff's confidential information. *Id.*

The *Sullivan* court noted that the parties expressly agreed to a one-year period of non-competition which had already expired. *Id.* The court further noted that restrictive covenants were viewed unfavorably in New York. *Id.* As a result, the court found that the one-year period of non-competition governed and could not be extended by the inevitable disclosure doctrine. *Id.*

Arkansas courts have expressed a similar disfavor for restrictive covenants. *See Federated Mut. Ins. Co. v. Bennett*, 818 S.W.2d 596, 597 (Ark. App. 1991) ("Covenants not to compete are not looked upon with favor by the law."). Moreover, the non-compete provisions executed between the parties have already expired. Accordingly, the Court finds that Defendants' non-compete provisions govern and should not be extended.

In sum, the Court finds that Systems has shown a substantial likelihood of success on the merits of their trade secret claim with regard to the design drawings and internal estimate worksheets. The Court further finds that Systems has not shown a substantial likelihood of success on the merits of their trade secret claim with regard to its customer lists or other financial documents.

### b. Breach of Employment Agreement

Systems also argues that it has shown a substantial likelihood of success on the merits regarding its claim that Defendants breached their employment agreements. Systems argues that Defendants Campbell and Henry signed identical employment agreements with Systems on August 5, 2012. Systems contends that the employment agreements contain post-employment confidentiality provisions which require Defendants to maintain the secrecy of Systems' "confidential information." The confidentiality provisions state, in part, as follows:

> No copies of Confidential Information shall be kept by Employee or removed from [Systems'] custody by photostatic, computers, electronically or otherwise. Furthermore, each party will use all reasonable efforts to prevent the disclosure of

any Confidential Information to employees or agents who do not require access to such information to properly perform their duties.

Plaintiff's Ex. No. 5 and 6. Confidential information is defined in the agreement as including designs, drawings, plans, specifications, customer lists, and pricing information related to Spray-Cooled equipment. According to Systems, Defendants breached their employment agreements by taking Systems' design drawings. In addition, Systems asserts that Defendants breached the agreements by requesting and obtaining Systems' drawings from Nucor.

Defendants counter that the evidence in the record does not support a finding that Campbell or Henry have breached or are likely to breach the confidentiality provisions. Defendants primarily argue Systems has failed to demonstrate that Campbell or Henry possess any of Systems' confidential information disclosed to them during their employment. In addition, Defendants argue there is no evidence that they have disclosed any confidential information to third parties.

The Court disagrees. As previously noted, the Court found that Defendants intentionally destroyed evidence which supports an inference that they misappropriated some of Systems' trade secrets and confidential information. Accordingly, the Court finds that Systems has demonstrated a substantial likelihood of success on its claim that Defendants breached confidentiality provisions contained within the employment agreements.

## B. Threat of Irreparable Harm

The second *Dataphase* factor the Court must consider is the threat of irreparable harm that Systems will suffer if the Court does not grant an injunction. "In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996). "Irreparable harm occurs when a party has no adequate remedy at law,

typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). A movant's "failure to demonstrate irreparable harm is a sufficient ground to deny a preliminary injunction." *Id*. at 320.

Systems offers two primary arguments to demonstrate that it has been irreparably harmed by Defendants. First, Systems argues that Defendants' misappropriation of its trade secrets cannot be measured in money damages and, thus, creates a presumption of irreparable harm. Systems cites Second Circuit case law in support of this proposition. *FMC Corp. v. Taiwan*, 730 F.2d 61, 63 (2d. Cir. 1984) (holding that "the loss of trade secrets cannot be measured in money damages" because "[a] trade secret once lost is . . . lost forever.").

The Court must first note that prior decisions from this district have held that all four *Dataphase* factors "must be weighed before deciding whether to issue a preliminary injunction, regardless of the subject matter of the underlying lawsuit." *Spears*, 929 F. Supp. 2d at 871 (making no presumptions of irreparable harm as to Arkansas Trade Secrets Act claims). In addition, the Second Circuit has held that such a presumption of irreparable harm is not automatic and may be unwarranted "[w]here a misappropriator seeks only to use those secrets— without further dissemination or irreparable impairment of value—in pursuit of profit. *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). The *Faiveley* court reasoned that a presumption is not warranted in such cases "because an award of damages will often provide a complete remedy for such an injury." *Id*. 118-19.

In the present case, the Court finds that a presumption of irreparable harm is unwarranted. Even considering Second Circuit precedent, Systems has failed to show that there is any danger that Defendants will disseminate its trade secrets to others or that Defendants have disclosed Systems' trade secrets to third parties. The record is also sparse with regard to whether

Defendants' misappropriation has caused or threatened to cause any irreparable impairment to the value of Systems' trade secrets. The current record reflects that Defendants have only solicited Nucor for its business, and Nucor was already in possession of at least some of Systems' trade secrets, such as design drawings. Without evidence that Defendants disseminated, disclosed or otherwise irreparably diminished Systems' trade secrets, the Court cannot presume that Systems has been irreparably harmed. As the *Faiveley* court noted, the only injury a plaintiff may suffer in such situations "is loss of sales to a competing product . . . [which] should be fully compensable by money damages." *Id*. at 119 (quoting *Geritrex Corp. v. Dermarite Indus., LLC*, 910 F.Supp. 955, 966 (S.D.N.Y.1996)).

Next, Systems argues that it has suffered irreparable harm as a result of a letter Defendant Henry addressed to Gary McQuillis, a technical manager of Nucor, concerning this action. In the letter, which is dated September 25, 2016, Henry wrote that if Systems is successful in the instant lawsuit, it will "be able to extend [its] monopoly and high pricing on spray cooling furnace equipment for the next decade." Plaintiff's Ex. No. 17. The letter also states that "Nucor has suffered under [Systems'] monopoly for almost 20 years." *Id*. Systems offered testimony to establish that Nucor is its largest, most important customer. Systems also provided testimony from Chuck Hays, CEO of the Systems Group, who stated that if Nucor chose to believe the information contained within the letter, Systems could go out of business.

Although the letter is addressed to McQuillis, there is conflicting evidence in the record regarding whether McQuillis actually received it. Dick Arthur, Systems' expert on low pressure spray cooling equipment, testified that it appeared the letter had been sent to McQuillis. Arthur later testified on cross-examination that he had no actual knowledge of whether the letter was sent. Defendants counter that there is no evidence in the record to establish that the letter was

sent to or seen by McQuillis. As a result, Defendants argue that Systems cannot prove a threat of irreparable harm. However, it is undisputed that the letter was sent to the personal email address of another Nucor manager, Charles Clark.

"Harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars." *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003). As a result, the Eighth Circuit has established that "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable injury." *Id.* (citing *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002)); *see also Wave Form Sys., Inc. v. AMS Sales Corp.*, 73 F. Supp. 3d 1052, 1058 (D. Minn. 2014) ("Harm to reputation and goodwill . . . can form sufficient irreparable harm to grant a preliminary injunction.").

The Court finds that Systems has demonstrated that it is threatened with irreparable harm because of the letter. Despite the conflicting evidence presented by the parties regarding whether the letter was actually sent to McQuillis as intended, it is undisputed that the letter was emailed to one of McQuillis' colleagues at Nucor. Although McQuillis may not have received the letter, the fact that Defendants' disparaging letter was received by an employee of Nucor could cause irreparable harm to Systems' reputation and goodwill by damaging a longstanding business relationship with Nucor and affecting future dealings between the companies. In light of the foregoing, the Court finds that Systems has sufficiently established a threat of irreparable harm. Therefore, this factor weighs in favor of an injunction.

## C. Balance of Equities

The Court must next balance the potential for harm to the moving party against any potential harm to the nonmoving party in the event an injunction issues. *Dataphase*, 640 F.2d at 114. Systems claims that if the Court does not issue an injunction, it stands to lose customers

and customer goodwill that it spent years cultivating. On the other hand, Defendants take the position that if Systems' request for an injunction is granted, they will be put out of business.

The Court agrees that, absent an injunction, Systems could potentially lose customers if Defendants are able to develop a competing low pressure, spray-cooling system using Systems' trade secrets. Conversely, the Court agrees that granting an injunction will have an impact on Defendants' business if it is enjoined from developing and supplying competing products to the steel industry. However, the record demonstrates that Defendants are engaged in business other than developing and supplying low pressure, spray-cooling equipment. For instance, Defendants have conducted studies and recommended modifications to existing furnace roofs at Nucor facilities. Accordingly, the Court finds that the balance of equities does not clearly favor either party.

### D. Public Interest

The final *Dataphase* factor that the Court must consider in its analysis is whether the issuance of an injunction is in the public interest. *Dataphase*, 640 F.2d at 114. Defendants assert that issuance of an injunction would be against the public interest because it would limit Defendants' ability to use publicly available patents to develop a competing product. The Court finds Defendants' argument unavailing considering that Systems has established a substantial likelihood of success on the merits with regard to Defendants' misappropriation of its design drawings and internal estimate worksheets. In addition, Defendants have failed to demonstrate that the information needed to design a competing low pressure spray-cooling system is readily ascertainable from publicly available patents. The Court thus concludes that the public interest in preserving fair competition and protecting trade secrets weighs in favor of granting injunctive relief.

In conclusion, the Court finds that a balance of the factors weighs in favor of granting Systems' request for a preliminary injunction. The Court, thus, concludes that Systems should be granted temporary injunctive relief.

## E. Scope of the Injunction

Because the Court has found that the balance of factors weighs in favor of granting an injunction, the Court must next consider the appropriate scope of the injunction. "The decision to issue an injunction, and the injunction's scope, are committed to the Court's discretion." *Mooney v. Allianz Life Ins. Co. of N. Am.*, No. CIV. 06-545, 2011 WL 1792966, at *4 (D. Minn. May 11, 2011) (citing *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 189 (8th Cir. 1993)). However, the Court's discretion to fashion injunctive relief is not unlimited. *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 790 (8th Cir. 2004). The Eighth Circuit has cautioned that district courts should tailor injunctions to remedy the harm suffered. *See E.E.O.C. v. HBE Corp.*, 135 F.3d 543, 557 (8th Cir. 1998) ("Provisions of an injunction may be set aside if they are broader than necessary to remedy the underlying wrong.").

In its Amended Motion for Preliminary Injunction, Systems requests that the Court enjoin Defendants, as well as anyone acting in concert with Defendants, from further misappropriation, disclosure, and use of Systems' trade secrets and confidential information until a trial on the merits can be held. In addition, Systems requests that the Court enjoin Defendants, as well as anyone acting in concert with Defendants, from directly or indirectly designing or supplying low pressure, spray-cooling equipment for the steel industry for a three year period. Systems further requests that the Court order Defendants to sign affidavits certifying their compliance with the specific terms of the Court's order.

As noted previously, Systems has demonstrated a substantial likelihood of success on the merits in proving that its design drawings and internal estimate worksheets constitute trade secrets and that they were misappropriated by Defendants through the use of electronic storage devices. Accordingly, the Court finds that it is appropriate to enjoin Defendants from further misappropriating, disclosing or using Systems' design drawings and internal estimate worksheets until a trial on the merits can be held or until the Court decides otherwise.

Systems also requests that the Court enjoin Defendants and anyone acting in concert with them from designing or supplying low pressure, spray-cooling equipment for the steel industry for three years. The Court finds this request overbroad. The Court first notes that Systems has failed to sufficiently explain why the duration of the proposed injunction should extend for a period of three years. In addition, the Court recognizes that Defendants have a right to utilize their own knowledge and experience of low pressure, spray-cooling equipment and technology to develop a competing product for the steel industry. This recognition is further strengthened in light of the employment agreement entered into by Systems and Defendants Henry and Campbell which included a two year non-compete provision that has since expired. As a result, the Court finds it appropriate to issue a more limited injunctive remedy by enjoining Defendants from using those items found to be trade secrets in this Memorandum Opinion to design and supply low pressure, spray-cooling equipment for the steel industry until a trial can be held on the merits or until the Court decides otherwise.

Lastly, the Court finds Systems' request that the Court direct Defendants to sign affidavits certifying their compliance with the Court's order to be unwarranted. The Court, thus, finds that Systems' request should be denied.

### F. Security Bond

Finally, the Court must consider the amount of security that Systems is required to post prior to the issuance of the injunction. Federal Rule of Civil Procedure 65(c) provides that "[t]he Court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The purpose of Rule 65(c) is "to enable a restrained or enjoined party to secure indemnification for any costs, usually not including attorney's fees, and any damages that are sustained during the period in which a wrongfully issued equitable order remains in effect." 11A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure: Civil* § 2954 (3d ed. 2002). "The amount of the bond . . . is plainly in the discretion of the district court." *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1279 (N.D. Iowa 1995) (citing *Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989)).

Although Systems has demonstrated a likelihood of success on the merits at this stage of the litigation, the Court concludes that Defendants will face financial damage if it is later determined that they were wrongly enjoined as a result of the preliminary injunction. As a result, the Court believes that requiring a security bond in some amount is warranted. Taking into account the express language provided in Rule 65(c), the evidence presented thus far, the amount of damages sought, and the purpose of the bond requirement, the Court finds that a security bond in the amount of $5,000,000 is appropriate.

## IV. CONCLUSION

In light of the above findings, the Court finds that a preliminary injunction should be issued. Accordingly, the Court finds that Systems' Amended Motion for Preliminary Injunction (ECF No. 61) should be and hereby are **GRANTED IN PART and DENIED IN PART**. The

Court further finds that Systems' Motion for Preliminary Injunction (ECF No. 12) should be and hereby is **DENIED AS MOOT**. An order of even date consistent with this Opinion shall issue.

        **IT IS SO ORDERED**, this 16th day of May, 2017.

<u>/s/ Susan O. Hickey</u>
Susan O. Hickey
United States District Judge